IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| **JORGE ESTE-MCDONALD** § | | **CIVIL ACTION NO. 1:22-cv-00005** |
| *Plaintiff* § | | |
| **V.** § | | |
| § | | |
| **WALMART INC.** § | | |
| *Defendant* § | | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S ORIGINAL COMPLAINT

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff, **JORGE ESTE-MCDONALD** for his Original Complaint against **WALMART INC.** In support of his Complaint, Plaintiff hereby states as follows:

## JURISDICTION AND VENUE

1. Plaintiff brings this action under the Age Discrimination in Employment Act of 1967 ("ADEA"), as it appears at 29 U.S.C. § 621 *et seq*, and under the Texas Commission of Human Rights Act ("TCHRA"), as it appears at Tex. Lab. Code § 21.001 *et seq*.

2. This Court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. § 1332, which gives district courts jurisdiction over actions involving citizens of different states and an amount in controversy exceeding $75,000.00;

   b. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, law or treaties of the United States;

c. 28 U.S.C. § 1343 (3) and (4), which give district courts jurisdiction over actions to secure civil rights extended by the United States government; and

d. 28 U.S.C. § 1367, which provides ancillary jurisdiction of Plaintiff's Texas state law claims.

3. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and Texas Workforce Commission ("TWC") on August 4, 2020, within one-hundred-eighty (180) days of his suspension and termination. *See* Exhibit A.

4. For claims investigated by the TWC, the Charging Party is afforded sixty (60) days from his receipt of Dismissal and Notice of Suit Rights to file suit under the TCHRA. For federal claims investigated by the EEOC, the Charing Party is afforded ninety (90) days from his receipt of Dismissal and Notice of Suit Rights to file suit under the ADEA. The EEOC/TWC issued suit rights on November 3, 2021, and Plaintiff files this suit within sixty (60) days of his receipt of the same. *See* Exhibit B.

5. Venue is appropriate in this judicial district because all or a substantial part events or omissions giving rise to Plaintiff's claims occurred in Orange County, Texas, making this district the most appropriate for suit.

## PARTIES

6. Plaintiff is a citizen of the United States and resides in the city of Lake Charles, Parish of Calcasieu, State of Louisiana.

7. Plaintiff is a 56-year-old male and, as such, is a member of a protected class. At all times relevant to this matter, Plaintiff was fifty-five (55) years old.

8. Defendant, **WALMART INC.** (hereinafter "Walmart") is a Delaware corporation that is authorized to conduct and is conducting business in the State of Texas. At all relevant times, Plaintiff was employed by Walmart at its facility located in Orange, Texas (Store #0777).

9. Upon information and belief, the amount in controversy exceeds $75,000.00.

10. At all relevant times, Plaintiff was employed by Defendant in the State of Texas.

## FACTUAL ALLEGATIONS

11. Plaintiff began his employment with Defendant as a Pharmacist on February 9, 2009, after being personally recruited by one of Defendant's corporate recruiters, Sharon Early.

12. At all relevant times, Plaintiff worked for Defendant at Store #0777, which is located in Orange, Texas.

13. When Plaintiff initially arrived at Store #0777, the pharmacy and its accompanying operations were in disarray. For example, Plaintiff witnessed employees blatantly disregard pharmacy processes, Walmart's attendance policy, and customer service generally. As a result, the pharmacy was not deriving profit at the time of Plaintiff's hire.

14. Within three (3) months after Plaintiff assumed management of the Store #0777 pharmacy, Plaintiff had rejuvenated its operations, placing great emphasis on employees following the Standard Operating Procedures, Best Practices, and Pharmacy Operations Manual.

15. As a result of Plaintiff's efforts, the Store #0777 pharmacy became a flagship store in the Texas market. Consequently, Plaintiff received numerous compliments from the Board of Pharmacy and the pharmacy Compliance team, and he was nominated for "Pharmacist of the Year" by Defendant's Market Managers.

16. As a result of Plaintiff's efforts and the resulting store performance of Store #0777, Defendant consistently sent new hires and technicians to Plaintiff's store for training.

17. Most of Plaintiff's personal training with Defendant pertained to basic, standard routines and protocols for Walmart as a whole. The written Pharmacy Operations Manual and Company Standard Operating Procedures are both exhaustive and voluminous, and Defendant tasks employees with reading and learning the procedures on their own time. Any computer-based training modules provide an overview and introduction to certain policies and does not include the full scope and/or detail of the same.

18. The "visual verification" process is a multi-step process that occurs after a prescription medication has been filled. The only training Plaintiff received from Defendant on the "visual verification" process was a computer-based introductory outline: it did not outline the in excess of twenty (20) steps required to perfectly execute the process.

19. On or about June 1, 2019, Walmart split its Southeast Texas and Southwest Louisiana areas, and Joy Ferris (hereinafter "Ferris") assumed the role as the Southeast Texas District Manager. At that time, Plaintiff began reporting directly to Ferris.

20. On February 18, 2020, Plaintiff participated in a conference call with several employees, including Ferris. During the call, Ferris simply requested that each employee, including cashiers and technicians (non-pharmacy employees) sign a document containing POM 1009, pertaining to the visual verification process. At no time during the call did Ferris review the process in depth or at length, nor did she ever ask whether any employee understood the implications of the written document.

21. Upon good information and belief, it was not standard business practice for Defendant to demand its employee to sign policy documents, especially in the absence of any statement

of "acknowledgment" that the employee has read and understood the document. None of the five former Market Managers predating Ferris' tenure ever required the entire market to sign a policy document.

22. On March 13, 2020, the United States government required business and school closures, as well as travel bans from certain countries, as a result of COVID-19. At that time, one of Plaintiff's staff pharmacists had been planning to leave for Europe which, in turn, would render him unable to return to the pharmacy in time for his next scheduled shift. Because Plaintiff works in a "Hard to Fill" market, Plaintiff informed Ferris and Defendant's Division Wellness Specialist to provide them with advanced notice that the employee schedule would need to be changed.

23. When the staff pharmacist returned home from Europe on March 26, 2020, he was still scheduled to work, at which time he contacted Plaintiff and asked for instruction. In response, Plaintiff instructed the staff pharmacist to self-quarantine since, at that time, there was no established quarantine protocol. Thereafter, Plaintiff informed Ferris of the same via email.

24. On March 31, 2020, a pharmacist associate informed Plaintiff of her belief that her neighbor, whom she had spent substantial time around, had contracted COVID-19. Out of an abundance of caution, Plaintiff instructed the associate to take time off to ascertain affirmatively whether the neighbor was COVID-19 positive.

25. Upon learning that Plaintiff had instructed the associate to stay home, Ferris contacted Plaintiff and instructed him to call her and obtain permission before sending any other employees home moving forward.

26. During numerous conference calls, Plaintiff voiced his concerns about not having personal protective equipment ("PPE") or a screening process to immunize customers. Thereafter, Plaintiff circulated an article discussing the high mortality rate of African Americans as a result of COVID-19.

27. Following Plaintiff's email containing the article, Ferris contacted Plaintiff to see "where his head was at." During the call, Plaintiff privately disclosed that one of his managers had been sent home with COVID-19-like symptoms without he or any authority being alerted of the same.

28. On April 6, 2020, Plaintiff discovered that associations were being asked to complete N95 waivers and being provided with a dust mask in lieu of the mandated N95 safety masks, which Plaintiff believed violated OSHA protocol. Plaintiff immediately contacted Ferris to discuss his concern, and Ferris told Plaintiff that she would "address it."

29. Plaintiff contacted Clinical Pharmacist, Robert Nguyen, with questions regarding customer screening protocols and PPE. During an email exchange on April 7, 2020, Mr. Nguyen provided Plaintiff with a screening sheet that Ferris had not previously disclosed to Plaintiff. The screening sheet indicated that Plaintiff had the ability and authority to send associates home under appropriate circumstances.

30. Plaintiff discovered a screening link and sent a photocopy of the same to both Ferris and Mr. Nguyen, asking whether the link reflected the appropriate screening protocols. Plaintiff never received a response to his question.

31. At approximately 7:00 p.m. on April 10, 2020, Ferris suddenly and unexpectedly placed Plaintiff on a suspension with pay. Plaintiff was not informed of the terms of his suspension, nor was he informed about the underlying basis for the same. Accordingly, at

the time of his suspension, Plaintiff had no knowledge of any purported infraction or misconduct at any kind.

32. Plaintiff repeatedly requested a copy of any disciplinary action documentation, and Defendant steadfastly refused to provide him with the same.

33. While Plaintiff later learned that Ferris accused Plaintiff of violating the "visual verification" process, at no time, either prior to or after Plaintiff's termination, has Defendant informed Plaintiff of the date on which the alleged violation took place.

34. Upon good information and belief, prior to April 10, 2020, the pharmacy had not suffered any medication errors, customer complaints, sentinel events, or any other incidents that have indicated customer safety was at issue as to warrant any kind of investigation by Defendant.

35. Upon good information and belief, Ferris did not actually observe any pharmacist, including Plaintiff, on April 10, 2020. Instead, upon good information and belief, Ferris placed Plaintiff on an unpaid suspension and thereafter engaged in a fishing expedition to uncover any kind of procedural infraction possible.

36. Ferris and Matthew Dehn, Regional Health and Wellness Director, interviewed Plaintiff and staff pharmacist, Chris Suire, on April 13, 2020. During the interviews, both Plaintiff and Mr. Suire were asked to verbalize the visual verification process in its entirety. Upon information and belief, due to the complexity and number of steps involved in the process, neither Plaintiff nor Mr. Suire, both of whom were tenured pharmacists with Defendant, could not recite all the steps from pure memory.

37. Following the interview, Plaintiff completed a Statement Form while sitting in his car. In his Statement, Plaintiff explained his tenure with Defendant, as well as his concern that

Defendant had recently engaged in a "fishing expedition" in order to launch an unnecessary and unwarranted investigation against him with the hopes of finding that may justify an otherwise unlawful termination. Plaintiff specifically stated, "I did not intentionally practice or direct anyone to derogate from standard operating procedure including visual verify. I have not intentionally failed to review prescription at visual verification or counsel." Plaintiff further stated that, if, upon review of video footage, he was found to have violated any policy, which he wholly disputes, that it was complete unintentional and that he should be permitted to redeem himself accordingly. Plaintiff ended his statement with: ""it is my hope that investigation is strictly to identify, correct and train. Not as a tool to remove due to other reasons. I am making the statement without lawyer representation, so doing so reluctantly."

38. On the evening of April 15, 2020, Plaintiff was the acting Pharmacy Manager, and he was notified the alarm company that two (2) individuals had entered the Store #0777 pharmacy without his knowledge. Upon information and belief, the two individuals who entered the pharmacy were Kayla Peltier, a Registered Pharmacist, and Walmart's Market Loss Prevention Manager. Upon information and belief, neither Ferris nor Dehn visited Store #0777 during the investigation of Plaintiff.

39. As a result of Plaintiff's suspension, Plaintiff initiated Defendant's Open Door process to voice his concerns that the suspension was a direct result of his "veteran pharmacist" status and recent efforts to remediate COVID-19 protocols within the pharmacy and market. Despite Plaintiff's communication with Defendant's regional division, the Open Door process was initiated and conducted by Dehn, who was involved in his suspension, as opposed to a neutral case manager or investigator.

40. On April 24, 2020, Plaintiff learned that he was being terminated for "not being a team player."
41. Once again, Plaintiff requested a copy of any disciplinary action forms and/or investigation results; however, Defendant refused to provide Plaintiff with the same.
42. Plaintiff filed for unemployment benefits through the TWC. In response to Plaintiff's request, TWC indicated that its investigation reveals that Defendant "fired [Plaintiff] for a reason that was not misconduct connected with the work." Plaintiff was thereafter approved to receive unemployment benefits.
43. Several weeks later, and after Plaintiff filed a formal ethics complaint, Plaintiff received a single cover sheet on June 17, 2020, which indicated that Plaintiff that he had been involuntarily terminated for "gross misconduct." The document further references "Visual Verification Investigation"; however, no investigation results were ever discussed with Plaintiff.
44. Plaintiff contacted the Open Door Hotline to contest his termination on April 24, 2020. Plaintiff learned that his case (HRC-1137783) was moved to the Ethics Committee and that an Ethics Charge and an Open Door request cannot occur concurrently.
45. Shortly thereafter, Plaintiff directed an email to the Ethics Committee, wherein he described the disproportionate firing of veteran pharmacists and replacement of the same with less qualified, younger pharmacists throughout the market. Plaintiff further explained that the disciplinary actions appeared to target the veteran pharmacists and that discipline was being inconsistently applied throughout the market. Plaintiff additionally noted his concern that his efforts to remedy deficiencies in Ferris' handling COVID-19 issues also contributed to his sudden and unexpected termination.

46. In his email to the Ethics Committee, Plaintiff also expressed his concerns regarding the neutrality of Defendant's Open Door policy, noting that the individual who initiated and investigated his complaint was an individual directly involved in the action Plaintiff contested.

47. Ultimately, Defendant did not materially address the visual verification with its employees until a meeting on Sunday, May 17, 2020. This meeting was led by both Ferris and Human Resources Director, Kendra Buford.

48. Within a matter of months after becoming the Walmart District Manager, Ferris terminated Plaintiff, along with several older pharmacists including Oluremi Olukoya and Donald Baker Jr., all for various technicalities that should not have resulted in termination. Plaintiff apprised Defendant of the "disproportionate firing" of these veteran pharmacists who, like him, received exceptionally harsh, otherwise unprecedented disciplinary action for what Defendant alleged to be improper execution of various pharmacy procedures.

**FIRST AND SECOND CAUSES OF ACTION:**
**AGE DISCRIMINATION IN EMPLOYMENT**
*Pursuant to Tex. Lab. Code Ann. § 21.101* and 29 U.S.C. § 621 *et seq*

49. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

50. Defendant is an "employer." Defendant is in engaged in an industry affecting commerce and who has 15 or more employees for each working day in each of 20 or more calendar weeks in the years 2019 and 2020.

51. Plaintiff is an "employee." Plaintiff was employed by Defendant at its facility located in Orange, Texas.

52. At the time of his termination, Plaintiff was over forty (40) years old and, as such, was a member of the protected age class.

53. Plaintiff was qualified for the position of Pharmacy Manager, as he was specifically promoted to the position and performed his job functions exemplarily for several years prior to his discharge.

54. Plaintiff was suspended with pay on April 10, 2020, and he was discharged on April 24, 2020. Accordingly, Plaintiff suffered a materially adverse employment action.

55. Upon good information and belief, Plaintiff was replaced by a younger employee, Paul Kulesa (Age: 30) ("Kulesa"). Further, upon good information and belief, at the time of Plaintiff's discharge, Kulesa: 1) had only been employed with Defendant for four (4) months and 2) had no managerial experience. Furthermore, during Kulesa's four-month employment, ethical charges had been lodged against him, and he had been placed under investigation for the same.

56. Upon good information and belief, Plaintiff was terminated from his position because of his age. To date, Plaintiff has not been shown any evidence suggesting that he violated any of Defendant's policies or procedures, including, but not limited to the "visual verification" process.

57. Additionally, even if Plaintiff improperly performed the "visual verification" process, which he adamantly disputes, Walmart treated similarly situated, non-protected employees more favorably. Other employees, outside the protected age class or otherwise substantially younger than Plaintiff, engaged in policy violations and/or generally performed poorly and, instead of being terminated, were issued a coaching, sent to training, and/or were offered an opportunity to improve.

58. As examples, upon good information and belief, Boa Tran (Age: 29), Ankit Shah (Age: 30) and Paul Kulesa (Age: 30) each violated the visual verification, and in fact, reported the same on Defendant's reporting platform: Safety Culture Reporting Tool (SCRT). Upon good information and belief, none of these individuals were investigated, much less terminated, for not properly following the "visual verification" process.

59. Most SCRT events are required to be reported and necessarily constitute a violation of the "visual verification" process. Pharmacists are required to review and visualize each medication before it leaves the pharmacy, and so any resultant SCRT event necessarily encompasses a failure to follow at least one step of the visual verification process.

60. At the time of his discharge, no adverse medical issue had even been attributed to Plaintiff in the SCRT, even though he had verified in excess of 300,000.00 prescriptions over his 11-year tenure.

61. In stark contrast to those similarly situated employees, Plaintiff was terminated outright, despite his exemplary performance record with Defendant.

62. Moreover, within a matter of months after becoming the Walmart District Manager, Ferris terminated Plaintiff, along with several older pharmacists including Oluremi Olukoya and Donald Baker, Jr., all for various technicalities that, under Walmart's progressive disciplinary policy, should not have resulted in termination.

63. The justification given for Plaintiff's termination is pretextual. Plaintiff was purportedly terminated for an event: 1) that he contends never happened, as Defendant never produced any proof or evidence of the same; 2) that, if it occurred (which Plaintiff disputes), was not "discovered" until after Ferris placed him on an otherwise unjustified suspension with pay; and 3) that, if it occurred (which Plaintiff disputes), did not actually constitute "gross

misconduct" or a terminable offense, as numerous other (and younger) employees failed to properly perform the "visual verification" process and were not discharged.

64. At the very least, and for purposes of the TCHRA, Plaintiff's age was a motivating factor in the decision to terminate him, given the disparate and more favorable treatment afforded to similarly situated employees outside of the protected age class.

65. Defendant's termination of Plaintiff was intentional, willful, and/or otherwise constitutes a reckless disregard for Plaintiff's protected legal rights.

66. Wherefore Plaintiff asks this Honorable Court to find Defendant, **WALMART, INC.,** liable for the violation of the Age Discrimination in Employment Act and Texas Commission of Human Rights Act.

**PRAYER:**

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendant providing the following relief:

(a) All damages to which Plaintiff may be entitled, including but not limited to back pay, reimbursement for lost position and training, social security and other benefits, front pay, and any and all statutory relief;

(b) Compensatory damages;

(c) Punitive damages;

(d) Liquidated damages (under the ADEA only);

(e) Reasonable attorney's fees, with conditional awards in the event of appeal;

(f) Pre-judgment interest at the highest rate permitted by law;

(g) Post-judgment interest from the judgment until paid at the highest rate permitted by law;

(h) Costs, including expert fees;

(i) Injunctive relief; and

(j) Such other and further relief, at law or in equity, to which Plaintiff may be entitled.

---

### DEMAND FOR JURY TRIAL

---

Plaintiff demands trial by jury in this action of all issues so triable.

            **Respectfully Submitted**,

            **SUDDUTH & ASSOCIATES, LLC**
            Attorneys-at-Law
            1109 Pithon St.
            Tel: (337) 480- 0101
            Fax:(337) 419- 0507
            Email: james@saa.legal

**BY:** */s/ James E. Sudduth, III*
    **JAMES E. SUDDUTH, III, #24093227**
    *Counsel for Plaintiff*